Filed 4/20/16  P. v. McClinton CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069285 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1203154) |
| JANICE SUSAN McCLINTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey J. Prevost, Judge.  Affirmed in part, reversed in part and remanded.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Janice Susan McClinton appeals a judgment following her jury conviction of 12 counts of procuring or offering a false or forged instrument for recording (Pen. Code,

§ 115),[1] three counts of attempted grand theft (§§ 664, 487, subd. (a)), and three counts of grand theft (§ 487, subd. (a)). The jury also found true allegations she took property exceeding $200,000 in value (§ 12022.6, subd. (a)(2)) and engaged in a pattern of related felonies that resulted in the taking of property exceeding $500,000 in value (§ 186.11, subd. (a)(2)). On appeal, McClinton contends: (1) the trial court should have consolidated two counts of grand theft (counts 10 & 13) and two counts of attempted grand theft (counts 16 & 18) into one count pursuant to *People v. Bailey* (1961) 55 Cal.2d 514; (2) the evidence is insufficient to support a finding she committed two or more related felonies within the meaning of section 186.11, subdivision (a)(2); (3) the court erred by imposing a full three-year consecutive term for the section 186.11, subdivision (a)(2), enhancement rather than a consecutive term of one-third of the midterm pursuant to section 1170.1, subdivision (a); (4) the court erred by not staying pursuant to section 654 punishment for counts 13, 16, and 18; (5) the prosecutor committed prejudicial misconduct by improperly arguing in closing that she did not present the testimony of a witness who could have potentially given corroborating testimony; and (6) to the extent she forfeited her claim of prosecutorial misconduct by not objecting below, she was denied effective assistance of counsel.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2014, a second amended information was filed charging McClinton with multiple counts of procuring or offering a false or forged instrument for recording

---

[1] All statutory references are to the Penal Code unless otherwise specified.

(§ 115) (counts 1, 2, 3, 5, 7, 8, 9, 11, 12, 14, 15 & 17), grand theft (§ 487, subd. (a)) (counts 6, 10 & 13), and attempted grand theft (§§ 664, 487, subd. (a)) (counts 4, 16 & 18). It also alleged that she engaged in a pattern of related felonies that resulted in the taking of property exceeding $500,000 (§ 186.11, subd. (a)(2)) and, in committing each of counts 10 and 13, she took property exceeding $200,000 in value (§ 12022.6, subd. (a)(2)).

At trial, the prosecution presented evidence showing McClinton worked together with Karen Tappert and/or Michael Williams to procure or offer false or forged instruments for recording and, in some cases, unlawfully take, or attempt to take, properties from their owners. Tappert testified that in 2007 and 2008 she associated with members of the "Montana Freemen," and formed the belief she could unilaterally cancel real estate and financial contracts if the other party did not disclose all relevant information in writing or if both parties did not sign the documents. She also believed that if a bank sold a promissory note, it became invalid because the original note was "mutilated" and the homeowner/borrower was therefore relieved of the debt. Because her house was in foreclosure, Tappert reviewed her mortgage documents, concluded there was fraud, and sent a notice of cancellation of her promissory note and deed of trust to the bank, loan servicer, trustee, and beneficiary, believing those documents would be cancelled if they did not timely respond to her notice.

Tappert also formed a company called Strike Back at Predatory Lenders, charging homeowners a fee to counsel them on how to fight foreclosures as she had. She held a conference in Las Vegas, where she met McClinton and tried to help her avoid losing her

3

Cambria Drive house that was in foreclosure. Tappert also paid McClinton to perform audits on clients' mortgage documents to determine if there was any "fraud" that would provide a basis for cancelling those documents. Tappert and McClinton also began counseling clients to transfer title to their homes to various associations created by Tappert and McClinton.

Williams, whose Gregory Circle house was in foreclosure, was contacted by McClinton, who claimed to be the area representative for Tappert's company and offered to help him save his house. She explained to him that he would transfer title to his house to a trust association that would then work with the lender to forgive the promissory note or lower its monthly payments because of predatory lending. Williams would then sign a lease agreement with the association and would pay it monthly rent in an amount less than his current monthly mortgage payment. Williams agreed and transferred title to his house to an association, signed a lease agreement, paid a $6,500 sign-up fee, and began paying $2,500 per month in rent to the association, which was controlled by McClinton. McClinton assured him the lender did not have the right to foreclose on his house. Soon thereafter, Williams was unable to continue paying his monthly rent and agreed to perform various jobs for McClinton and Tappert, including signing and recording forged and false deeds, inspecting abandoned properties, and changing locks on properties. McClinton assured him he had the authority to sign those deeds.

*McClinton's house* (*counts 1-4*). Soon after McClinton's house was foreclosed on, she told Williams to sign a grant deed forged by Tappert, purporting to transfer ownership of the house from the lender to an association controlled by Tappert. The deed

4

was signed by Williams and recorded. McClinton later told Williams to sign a general warranty deed, purporting to transfer the house from Tappert's association to an association controlled by McClinton. The deed was signed by Williams and recorded. McClinton later had her family members sign and notarize a false deed, purporting to transfer the house from her association to another association she controlled. She assured them they had the authority to do so. The deed was recorded. McClinton attempted to sell the house to Blackwood Properties, but escrow was cancelled when the title company discovered she did not own it.

*Sky Flower Circle House* (*counts 7 & 8*). After Williams's house was foreclosed on and he was evicted, McClinton told him he could live in a house on Sky Flower Circle. He did not know that house was in foreclosure proceedings. McClinton told Williams to sign a trustee deed upon sale showing the Sky Flower Circle house was foreclosed on and title was transferred to an association controlled by Tappert. She assured him he had the authority to do so. That deed was recorded. A few months later, Daniel Park showed Williams a sales receipt indicating he had purchased the Sky Flower Circle house at an auction. Williams claimed to be a bank representative, showed Park the forged deed, and stated the bank still owned the house. McClinton later assured Williams the association had title to the house and Park was mistaken. McClinton then had a family member notarize a false deed of trust, indicating one of Tappert's associations had received a loan from another association controlled by Tappert. Per McClinton's instructions, Williams then recorded the deed. One month later, Park returned with a law enforcement officer and presented a trustee's deed upon sale showing

5

he (Park) owned the Sky Flower Circle house. After Williams was required to leave the house, McClinton assured him they still had title to the house and there was an issue with the paperwork that she would resolve.

*Abandoned houses* (*counts 9-18*). Tappert found four houses that had been foreclosed on and vacated by their previous owners (i.e., houses on Cleveland Way, Gregory Circle, Butterfly Bush, and Tigertail Road). Tappert told McClinton to give her all the deed information regarding those houses. McClinton told Williams to make sure there were no squatters in the houses and then change the locks. Tappert forged a deed for each house, purporting to transfer title to an association controlled by her. All four deeds were recorded. McClinton apparently then asked Williams to find buyers for the houses. After Williams found a potential buyer, the Griffin company (Griffin), McClinton told him to show the houses to the buyer's agent. Griffin offered $495,000 for the Cleveland Way house, $490,000 for the Gregory Circle house, $399,999 for the Butterfly Bush house, and $1,450,400 for the Tigertail Road house. McClinton accepted all four offers and opened escrow. She contacted the escrow company, told it she was helping Taggert with the transaction documents, and instructed it how to distribute the sale proceeds.

Escrow closed first on the Cleveland Way and Gregory Circle houses with Griffin transferring the purchase funds and Tappert forging a grant deed for each house purporting to transfer title from her association to Griffin. The deeds were recorded. The

6

sale proceeds were split evenly among McClinton, Tappert, and Williams. McClinton received over $300,000 as her share of the sale proceeds.[2]

Before escrow could close on the Butterfly Bush and Tigertail Road houses, Griffin suspected the sales were fraudulent and told Williams that Tappert's name was "all over the internet." When Williams confronted McClinton regarding that allegation, she told him someone had stolen Tappert's identity and she was working with the FBI to resolve the issue. Griffin cancelled escrow on the purchase of the other two houses. McClinton apparently would have received about $500,000 had escrow closed on the sale of those houses.

*Castro family* (*counts 5-6*). McClinton contacted Lilia Castro and offered to help save her father's Preston Street house from foreclosure. McClinton reviewed Castro's mortgage documents, claimed to have found many errors in them, and advised Castro to consult an attorney for help. However, after an attorney could not help Castro and her father and they were unable to pay the mortgage payments, the house was foreclosed on. Soon after the foreclosure, McClinton told Castro she had a way to save the house. Investors would buy the house from the lender and then lease it back to Castro's father. If he paid rent for five years, the investors would consider giving the house back to him. Castro met with McClinton and Tappert in Las Vegas to discuss the details of the plan. McClinton assured Castro the plan would work because she had used it for her own

---

[2]     McClinton later told law enforcement officers she received the $300,000 in sale proceeds on behalf of Tappert and had promised Tappert the money was safe in her account.

house.  Castro agreed to pay a $4,500 initial fee and $1,500 per month in rent. McClinton gave Castro a general warranty deed and instructed her to sign it and record it. The deed purported to convey title of her father's house from the lender to an association controlled by Tappert.  Castro signed and recorded the deed and her father paid the initial fee and monthly rent for a few months.  Nevertheless, Castro and her father were eventually evicted from the house after having paid over $3,600 to McClinton and Tappert.

*Defense evidence*.  In her defense, McClinton testified, generally denying she committed any fraudulent acts or knew Tappert was forging or filing fraudulent deeds. She testified she believed the attempted sale of her house was bona fide.  She testified she worked with Adventis Group and attorney Lindsay (or Lindsey or Lyndsey) Heller to attempt to obtain a loan modification.  On the advice of Adventis Group, she transferred a 50 percent interest in her house in an attempt to delay foreclosure.  Heller charged McClinton $35,000 for her legal services, including assisting her with filing a lawsuit against her lender.  Heller referred her to Tappert for further assistance in avoiding foreclosure.  McClinton testified she had no knowledge regarding the loan modification process and relied on Heller and Tappert to help her.  She testified Heller assured her Tappert's methods were legal.

McClinton testified she first met Tappert at a seminar Tappert hosted in Las Vegas.  She entered into an agreement for Tappert's services and paid an initial fee of $4,500 and $1,800 per month in rent pursuant to a lease agreement until a loan modification was accepted by the bank.  Tappert asked McClinton to perform audits on

8

mortgage documents and she agreed despite having no experience in performing audits. Tappert gave her training materials and paid her from $500 to $1,000 per audit. Tappert later told McClinton she had purchased her (McClinton's) house from the bank. McClinton denied she had signed, filed, or seen any of the fraudulent deeds related to her house.

McClinton testified she agreed with Tappert's suggestion that she sell her (McClinton's) house and give Tappert 50 percent of the proceeds. Tappert prepared a deed transferring ownership to one of McClinton's associations. McClinton did not believe anything was illegal. She later met Williams, who suggested to her they form a partnership to sell the houses she owned. McClinton denied signing documents related to the four abandoned houses sold to Griffin, even though her name was on them. She also denied telling Williams what to do, stated she did not know he changed the locks on the houses, and denied he asked her permission to show the houses to potential buyers. She denied having anything to do with the sale of the four abandoned houses. She denied she was Taggert's or Williams's partner and claimed she only performed audits and reviewed purchase offers. She never suspected any wrongdoing in the sale of the four houses to Griffin. When she received money after the sale of the first two houses to Griffin, McClinton claimed that money was for the 250 to 300 audits she had performed for which she had not yet been paid.

*Rebuttal evidence*. In rebuttal, the prosecution presented the testimony of Priti Patel, a public notary, who testified she notarized a trustee's deed upon sale signed by McClinton. McClinton signed Patel's notary journal and placed her fingerprint near her

signature. That deed was identical to one fraudulently recorded and purporting to transfer title to the Sky Flower house from one of Tappert's associations to another. However, the deed signed by McClinton was not the one recorded.

*Jury verdict and sentence*. The jury found McClinton guilty on all counts and found true all of the enhancement allegations. The trial court sentenced her to a total prison term of 11 years 4 months. The court imposed a two-year prison term for count 10 with a consecutive two-year term for the related section 12022.6, subdivision (a)(2), enhancement, consecutive four-month terms for each of counts 4, 16, and 18, consecutive eight-month terms for each of counts 6, 7, 8, and 13, with eight months for the enhancement to count 13, and a consecutive three-year term for the section 186.11, subdivision (a)(2), enhancement. It stayed pursuant to section 654 sentences for counts 1, 2, 3, 5, 9, 11, 12, 14, 15, and 17. McClinton timely filed a notice of appeal.

## DISCUSSION

### I

#### *Application of Bailey Doctrine*

McClinton contends the trial court erred by not applying the *Bailey* doctrine to combine counts 10, 13, 16, and 18 into a single count of grand theft because all of those offenses were committed pursuant to one common scheme.

#### A

*Bailey doctrine*. In *Bailey*, the defendant committed a single misrepresentation that resulted in her continued receipt of welfare payments, which individually constituted petty thefts but collectively amounted to grand theft. (*People v. Bailey*, *supra*, 55 Cal.2d

10

at pp. 515-516, 518, fn. 3.)  *Bailey* stated: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan."  (*Id*. at p. 519.)

In *People v. Whitmer* (2014) 59 Cal.4th 733, the California Supreme Court interpreted its *Bailey* decision as holding "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme."  (*Id*. at p. 741.)  Noting post-*Bailey* cases had interpreted *Bailey* more broadly to preclude multiple counts of grand theft pursuant to a single scheme, *Whitmer* disapproved those cases to the extent they were inconsistent with its interpretation, but concluded its more restrictive interpretation of *Bailey* should apply prospectively only and therefore did not apply to the defendant's case.  (*Whitmer,* at pp. 739-742.)

B

*Application of Bailey doctrine to this case*.  McClinton asserts, and the People concede, the *Bailey* doctrine should be applied in this case to combine counts 10, 13, 16, and 18 into one count of grand theft.  Those four counts involved the sale, or attempted sale, of the four abandoned houses to Griffin at about the same time.  McClinton had only one intention, one general impulse, and one plan; i.e., to sell to Griffin the four houses she, Tappert and Williams fraudulently obtained.  Therefore, applying the pre-*Whitmer* cases interpreting *Bailey* to the facts in this case (because *Whitmer* was issued after

11

McClinton's commission of the instant offenses), the two counts of grand theft (counts 10 & 13) and two counts of attempted grand theft (counts 16 & 18) should have been combined into one count of grand theft.  (Cf. *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1150-1151 [only one theft offense under *Bailey* doctrine where no evidence thefts were committed pursuant to different schemes or plans]; *People v. Packard* (1982) 131 Cal.App.3d 622, 626-627; *People v. Richardson* (1978) 83 Cal.App.3d 853.) McClinton's convictions on counts 13, 16, and 18 must be reversed.  (Cf. *Richardson*, at pp. 866, 868.)

II

*Substantial Evidence to Support True Finding on*
*Section 186.11, Subdivision (a)(2), Allegation*

McClinton contends the evidence is insufficient to support the jury's finding she committed "two or more related felonies" within the meaning of section 186.11, subdivision (a)(2).

A

Section 186.11, subdivision (a), provides:

> "(1)  Any person who commits *two or more related felonies*, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3).  This enhancement shall be known as the aggravated white collar crime enhancement. The aggravated white collar crime enhancement shall only be

12

imposed once in a single criminal proceeding. For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events. *For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions.*

"(2) If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison. . . ." (Italics added.)

B

When a defendant challenges the sufficiency of the evidence to support a judgment or finding, we apply the substantial evidence standard of review. Generally, our task "is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our

13

'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) The standard of review is the same in cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.)

C

In her opening appellant's brief, McClinton asserts the true finding on the section 186.11, subdivision (a)(2), allegation must be reversed because there is insufficient evidence she committed "two or more related felonies" within the meaning of that subdivision. However, we conclude there is substantial evidence to support the jury's inference that McClinton committed felonies against two or more victims who suffered losses in excess of $500,000. The evidence shows she committed felonies against Griffin, Park, Castro and Castro's father. The evidence also shows the aggregate losses suffered by those victims as a result of McClinton's fraudulent conduct exceeded $500,000. Griffin lost over $500,000 in McClinton's fraudulent sales of the Cleveland Way and Gregory Circle houses to it. Also, Castro's father lost $3,600 in McClinton's

14

fraudulent scheme. Section 186.11, subdivision (a)(2), does not require that each victim suffer a loss in excess of $500,000. (*People v. Denman* (2013) 218 Cal.App.4th 800, 813.) There is substantial evidence the aggregated losses of two or more victims (i.e., Griffin and Castro's father) exceeded $500,000 for purposes of the section 186.11, subdivision (a)(2), enhancement. (*Denman,* at p. 813.)

Although we need not address McClinton's additional argument she first raised in her reply brief, we nevertheless reject her belated argument that the evidence is insufficient to support a finding there was a "pattern of related felony conduct" within the meaning of section 186.11, subdivision (a)(2). She argues there was no connection between her offenses against Griffin and against the Castros, and therefore they could not constitute a "pattern of related felony conduct" within the meaning of section 186.11, subdivision (a)(2). She notes her offenses against the Castros occurred during 2008 and 2009 and her offenses against Griffin occurred during 2010. She further notes her offenses against the Castros involved leading them to believe she had taken action to remedy the foreclosure on their home and causing them to make rent payments to her for the home, while her offenses against Griffin involved the recording of false deeds and attempts to sell properties to it. Because she used different methods to commit her offenses against the Castros and against Griffin, had different victims, and had different purposes, she argues those offenses could not constitute a pattern of related felony conduct. (§ 186.11, subd. (a)(2).)

However, section 186.11, subdivision (a)(1)'s definition of "pattern of related felony conduct" is much broader than McClinton implicitly asserts. That statute states:

15

" '[P]attern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (§ 186.11, subd. (a)(1).) Her offenses against the Castros and Griffin both involved fraudulent conduct and had similar purposes. Her fraudulent scheme presumably sought that both the Castros and Griffin believe her representations that she, Tappert, or one of their associations had lawfully obtained ownership of properties pursuant to lawfully executed and recorded deeds transferring ownership of those properties, thereby causing her victims to pay either rent (the Castros) or purchase money (Griffin) to acquire the tenancy or fee ownership of the properties in reliance on her fraudulent misrepresentations. Accordingly, we conclude McClinton's felony offenses against the Castros and Griffin had similar purposes, results, and/or methods of commission such that they constituted a pattern of related felony conduct within the meaning of section 186.11, subdivision (a)(1).

## III

### *Full Consecutive Sentence under Section 186.11, Subdivision (a)(2)*

McClinton contends the trial court erred by imposing a full three-year consecutive term for the section 186.11, subdivision (a)(2), enhancement rather than a consecutive term of only one-third of the midterm (i.e., one year) pursuant to section 1170.1, subdivision (a). We disagree.

16

## A

In sentencing McClinton, the trial court chose count 10 as the principal term, imposing the midterm of two years as the base term for that offense and an additional two-year term for the section 12022.6 enhancement related to that offense. The court also imposed a full consecutive three-year term for the section 186.11, subdivision (a)(2), enhancement.

## B

McClinton correctly notes section 1170.1, subdivision (a), sets forth a general rule that when a trial court imposes consecutive terms for subordinate offenses and related enhancements, only the principal term and its related enhancements shall be full terms and the subordinate terms for the consecutive offenses and their related enhancements shall be one-third of the midterm for subordinate offenses and one-third of the term imposed for specific enhancements related to those offenses. She further correctly notes section 1170.11 provides that the term "specific enhancement" under section 1170.1 includes an enhancement imposed under section 186.11.

Section 186.11, subdivision (a)(2), provides that if its elements are satisfied, an additional term of two, three, or four years in prison shall be added and served consecutively to the sentences imposed for the underlying felony offenses. Importantly, section 186.11, subdivision (b)(2), provides: "The additional prison term provided in paragraph (2) of subdivision (a) shall be in addition to any other punishment provided by law, including Section 12022.6, and *shall not be limited by any other provision of law*." (Italics added.) Accordingly, construing the language of sections 1170.1, subdivision (a),

17

and 186.11, subdivision (b)(2), together, we conclude the general limitation on consecutive terms for subordinate offenses and their related enhancements provided by section 1170.1, subdivision (a), does *not* limit the additional punishment provided by section 186.11, subdivision (a)(2).

Analogous cases involving the same language in other statutes support our interpretation. *People v. Madrigal* (1997) 57 Cal.App.4th 400 construed the phrase "shall not be limited by any other provision of law" as used in Health and Safety Code section 11353.6, subdivision (e), concluding former section 1170.1, subdivision (g)(1)'s sentencing limitation (i.e., limiting a prison term to double the base term) did not apply to limit the school-zone sentence enhancement provisions of Health and Safety Code section 11353.6, subdivision (e). (*Madrigal,* at pp. 402-403.) *People v. Hernandez* (1993) 18 Cal.App.4th 1840 reached a similar conclusion in interpreting the same phrase, "shall not be limited by any other provision of law," as used in Health and Safety Code section 11353.1, subdivision (c). (*Hernandez,* at pp. 1845-1846.) *Hernandez* concluded former section 1170.1, subdivision (a)'s sentencing limitation (i.e., exclusion of enhancements related to subordinate nonviolent felonies) did not apply to preclude the imposition of a full-term age-difference enhancement under Health and Safety Code section 11353.1, subdivision (a)(3), because Health and Safety Code section 11353.1, subdivision (c), provided that punishment under that section "shall be in addition to any other punishment provided by law and shall not be limited by any other provision of law." (*Hernandez,* at pp. 1845-1846.) The court reasoned that because that statute's language was unambiguous, the rule of lenity, which requires an interpretation in a

18

defendant's favor if a statute is reasonably susceptible of two constructions, did not apply. (*Id*. at p. 1845.) *Hernandez* further reasoned that because Health and Safety Code section 11353.1 was a specific statute dealing with the defendant's particular conduct, it controlled over the more general provisions of former section 1170.1, subdivision (a). (*Hernandez,* at p. 1846.)

Applying the reasoning of *Madrigal* and *Hernandez* in the context of this case, we conclude the language of section 186.11, subdivisions (a)(2) and (b)(2), requiring the imposition of a full-term white collar crime enhancement, which "shall not be limited by any other provision of law," is unambiguous and relates to McClinton's specific conduct and therefore controls over the more general sentencing limitations provided by section 1170.1, subdivision (a). The trial court correctly imposed a full three-year consecutive term for the section 186.11, subdivision (a)(2), enhancement.

## C

McClinton alternatively asserts that if, as we concluded above, the trial court properly imposed a full three-year consecutive enhancement under section 186.11, subdivision (a)(2), then section 1170.1, subdivision (a)'s provisions should have been applied to limit the two-year section 12022.6, subdivision (a)(2), enhancement imposed by the court to only one-third of that term (i.e., an eight-month term). However, the court chose count 10 as the principal count, imposing a base term of two years for that offense and adding a consecutive two-year term for the section 12022.6, subdivision (a)(2), enhancement related to that count. Section 1170.1, subdivision (a), does not limit the term imposed for an enhancement related to a base or principal term, but only a term

19

imposed for an enhancement related to a subordinate count for which a consecutive term is imposed.[3]  Because count 10 was chosen as the principal or base term, the section 12022.6, subdivision (a)(2), enhancement related to that count was properly imposed by the court at its full two-year term, rather than at one-third of the midterm.  Furthermore, to the extent McClinton argues the court should have instead chosen count 18 as the principal base term and made count 10 and its related enhancement subordinate consecutive terms, we conclude the court properly exercised its sentencing discretion in choosing count 10 rather than count 18 as the principal or base term.[4]  McClinton does not persuade us the court abused its sentencing discretion.

---

[3]     Section 1170.1, subdivision (a), provides in pertinent part: "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements.  The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."

[4]     She further argues that had the court chosen count 18 as the principal or base term, then the section 186.11, subdivision (a)(2), enhancement would have been properly imposed at its full three-year term because, as the People note, that enhancement was specifically related to count 18.  However, neither the record nor section 186.11, subdivision (a)(2), supports a reasonable inference that enhancement was related to only a single count (i.e., count 18) and not other counts.  Although the information included the section 186.11, subdivision (a)(2), allegation after all of the specific counts (i.e., counts 1-18) and therefore it physically appeared after count 18, neither the language of that allegation nor evidence or arguments at trial limited that allegation to only count 18.  Instead, that allegation related to all of the counts relating to the Castros and Griffin (i.e., counts 10-18) and therefore was, in effect, a "global" enhancement that did not relate solely to count 18.  Accordingly, McClinton's argument that the court should have chosen count 18 as the principal or base term would not have changed our reasoning above regarding the imposition of a full three-year consecutive term for the section 186.11, subdivision (a)(2), enhancement.

IV

*Section 654*

A

*McClinton's contention.*  McClinton contends the trial court erred by not staying, pursuant to section 654, punishment for counts 13, 16, and 18.  However, because we concluded above counts 13, 16, and 18 should have been combined with count 10 pursuant to the *Bailey* doctrine, her section 654 contention is now moot and we need not address its merits.

B

*The People's contention.*  Nevertheless, the People assert the trial court erred, and imposed an unauthorized sentence, by staying pursuant to section 654 punishment for counts 9, 11, 12, 14, 15, and 17.  The People note those counts involved the procuring or offering of six different false or forged deeds for recording in violation of section 115, subdivision (a).  The People may raise on appeal the issue of an unauthorized sentence despite the absence of an objection below.  (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

Section 654, subdivision (a), precludes "multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective."  (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.)  If all of the criminal acts were merely incidental to, or the means of accomplishing or facilitating, one objective, a defendant may be punished only once. (§ 654, subd. (a); *People v. Conners* (2008) 168 Cal.App.4th 443, 458.)  However, if a defendant had several independent criminal objectives, he or she may be punished for

21

each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. (*Conners*, at p. 458.)

Section 115, subdivision (d), provides: "For purposes of prosecution under this section, each act of procurement or of offering a false or forged instrument to be filed, registered, or recorded shall be considered a separately punishable offense." *People v. Gangemi* (1993) 13 Cal.App.4th 1790 interpreted that statutory language in the context of two fines imposed under section 115.5, and concluded section 654's prohibition on multiple punishments did not apply because section 115, subdivision (d), "demonstrates an express legislative intent to exclude section 115 from the penalty limitations of section 654." (*Gangemi*, at p. 1800.) The court concluded each false filing was separately punishable because "the Legislature has unmistakably authorized the imposition of separate penalties for each prohibited act even though they may be part of a continuous course of conduct and have the same objective." (*Ibid*.) The Legislature has the power to preclude the application of section 654 in certain circumstances without expressly referring to section 654. (See *People v. Benson* (1998) 18 Cal.4th 24, 32-33.) Because the language of section 115, subdivision (d), is unambiguous and clearly provides that each act of procuring or offering a false or forged deed for recording "shall be considered a separately punishable offense," we, like *Gangemi*, conclude section 654 does not apply to preclude multiple punishments for acts in violation of section 115 offenses even though they may have been incidental to, or the means of accomplishing or facilitating, one objective. (Cf. *Gangemi*, at p. 1800.) We conclude the trial court imposed

22

unauthorized sentences on counts 9, 11, 12, 14, 15, and 17 when it stayed punishment for those counts pursuant to section 654.[5] On remand, the court shall impose appropriate sentences for those counts without staying execution of the sentences pursuant to section 654.

V

*Alleged Prosecutorial Misconduct*

McClinton contends the prosecutor committed prejudicial misconduct by improperly arguing in closing that she did not present the testimony of a witness (i.e., Heller) who could have potentially given corroborating defense testimony.

A

Before trial, McClinton's counsel stated Heller would be a witness for the defense and the defense had not yet been able to serve or interview her. After the prosecution completed its case-in-chief at trial, McClinton filed a motion to continue the trial for five days so Heller could be located and served with a subpoena to appear at trial, arguing her testimony was relevant to the defense of advice of counsel. The motion stated Heller had not responded to defense telephone calls or attempts to contact her. A defense investigator attempted to contact Heller at her home, but she refused to answer the door.

---

[5] To the extent McClinton argues the trial court properly stayed pursuant to section 654 punishment for counts 9, 11, 12, 14, 15, and 17 because each of those counts was factually related to charges of grand theft or attempted grand theft (e.g., counts 10, 13, 15, 16, and 18), we are not persuaded by her argument that section 115, subdivision (d)'s clear language should not govern when a section 115 offense is paired with a related non-section 115 offense, thereby allowing section 654's prohibition on multiple punishment to apply.

23

However, Heller gave a telephone interview with the prosecution's investigator. McClinton's counsel initially stated she was not sure Heller would testify truthfully. In support of the motion, McClinton's counsel gave an offer of proof that Heller: (1) introduced McClinton to Tappert; (2) assisted McClinton in her defense of the unlawful detainer action to evict her from her home; (3) assisted McClinton in filing deeds; and (4) advised McClinton that Tappert's methods were lawful and, if Heller testified truthfully, she would admit she advised McClinton her conduct was lawful.

The prosecution did not dispute the defense's offer of proof, but stated its investigator had interviewed Heller. Heller stated she assisted McClinton in attempting to stop the foreclosure of her house on Blue Jay, which was not a property involved in this case. Heller denied she told McClinton to file title documents to delay foreclosures. However, she admitted her law license had been previously suspended for "practicing questionable loan modification-type services" and she stated "banks didn't actually own the loans that went to the borrowers. It was actually investors who owned the money. They were the ones who had the actual title to the houses, but they would rather have the houses be in foreclosure, so they would lose the paperwork and do apparently nefarious practices." The prosecution conceded those statements were consistent with Tappert's philosophy. The trial court granted McClinton's motion to continue the trial until October 6, 2014, finding Heller's testimony was relevant and material to McClinton's defense and there was a reasonable prospect of Heller being served in a timely fashion.

However, on October 6, McClinton's counsel informed the court Heller had been served, but failed to appear in court. Her counsel stated Heller would testify only if she

24

could stop every 15 minutes and if the defense would reimburse her for her travel expenses, which the defense apparently could not do. Because Heller failed to appear, McClinton's counsel requested a bench warrant and an additional one- or two-day continuance. On October 7, the defense counsel informed the court her investigator had gone to Heller's residence on October 6 and knocked on the door, but Heller refused to open it. Also, the defense had apparently made a clerical error and inserted the wrong date to appear on the subpoena served on Heller. The prosecutor opposed McClinton's request for an additional continuance. The court denied her request for a second continuance, stating its belief Heller would continue to evade service of a subpoena and would not voluntarily appear.

The defense case proceeded and McClinton testified she had read an article written by Tappert regarding fighting foreclosures and Heller then told her the "process" Tappert used was legal. McClinton testified she never doubted the legality of Tappert's process and believed Tappert and Heller were working together. On cross-examination, McClinton admitted Heller advised her only regarding what to allege in her personal lawsuits against her lender and how to perform audits on mortgage documents. McClinton denied Heller advised her she could: (1) legally cancel a deed of trust; (2) send notices of cancellation to parties involved in a deed of trust and, if they did not respond, consider their silence as acceptance of cancellation of the deed of trust; (3) eliminate a mortgage by filing a title document; and (4) file a title document and then sell the property related to that document without first paying off the mortgage. McClinton confirmed that Heller had not yet come forward to testify at trial. She agreed she had a

25

strong motive to tell the jury she relied on Heller's advice. The prosecutor asked her whether without "Heller coming forward and testifying, we have to trust you are telling the truth; correct?" She replied, "I am."

The trial court instructed the jury that "[n]either side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant." It also instructed on the defenses of mistake of fact and mistake of law.[6]

During closing argument, the prosecutor stated McClinton was not guilty if she reasonably believed what she was doing was lawful. However, he then argued McClinton was never actually advised by an attorney that her conduct was legal and her testimony about Heller's advice was an after-the-fact justification. He argued that even if Heller had advised McClinton on the legality of her conduct, she nevertheless could not have reasonably believed her actions were legal. During the defense closing argument, McClinton's counsel argued she was not guilty of the charged offenses because she

---

6      The court instructed with CALCRIM No. 3406 on mistake of fact, stating McClinton would be not guilty of grand theft or attempted grand theft if the jury found she "believed that she was in lawful possession, ownership and/or she had lawful authority to engage in the selling of, or attempted selling of the properties alleged in Counts 4, 6, 10, 13, 16, [and] 18, and if you find that belief was reasonable . . . ." It instructed on mistake of law, stating, in part, that McClinton would not be guilty of grand theft or attempted grand theft if she "did not have the intent or mental state required to commit the crime because she held a good faith belief that she was not breaking the law or that she, in good faith, believed her acts were lawful." It further instructed with CALCRIM No. 3407 that "[i]t is not a defense to the crimes of procuring filing of false document that the defendant did not know she was breaking the law or that she believed her act was lawful."

believed her conduct was lawful based on Heller's representations that her conduct was legal.

In rebuttal, the prosecutor argued that: (1) McClinton "followed the advice of Lindsay Heller. There is no Lindsay Heller that testified, no documents to support that"; (2) "[McClinton] is asking you to believe that [Heller], who didn't come [and] testify, . . . gave [her] some sort of advice that [she] relied on. She might as well have said an alien came down and gave [her] advice. And that is what [she] relied on, because you have no evidence of what exactly Lindsay Heller told her"; (3) "Defense said, 'Well, we're not required to call every witness.' That is true. But if you don't call the reasonable witnesses that need to come and prove your case, you have to face the consequences [of] that"; (4) "I didn't have to call Lilia Castro. If I hadn't, would you have gotten a good picture of what had happened? And that is the problem with relying on this lawyer who didn't come and testify"; (5) "Defendant didn't give any specifics as to what she actually relied on in her own testimony. She said, 'They said it was legal.' And even if she had been advised, that still wouldn't be reasonable under the circumstances"; and (6) regarding McClinton's belief the unlawful detainer action had been resolved in her favor, "[i]t was verified by a lawyer, who we haven't heard from and who she couldn't actually explain what was advised to her."

B

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial

27

fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).) "[W]hen the claim [of prosecutorial misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid.*)

It is error for the prosecutor to comment directly or indirectly on a defendant's failure to testify in his or her own defense. (*Griffin v. California* (1965) 380 U.S. 609, 615; *People v. Medina* (1995) 11 Cal.4th 694, 755.) Nevertheless, a prosecutor may comment on the state of the evidence or on a defendant's failure to present material evidence or call logical witnesses. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339; *Medina*, at p. 755.) Furthermore, "[t]he prosecutor may argue all reasonable inferences from the record, and has a broad range within which to argue the facts and the law. [Citation.] The prosecutor, however, may not mislead the jury." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758.) A prosecutor may invite the jury to draw a logical inference based on the state of the evidence and, in general, may comment on a defendant's failure to call available witnesses. (*People v. Ford* (1988) 45 Cal.3d 431, 449.)

To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error. (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp* (1999) 20 Cal.4th 826, 858.)

28

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial misconduct or error does not require reversal of the judgment unless it was prejudicial under state law, i.e., it is reasonably probable the defendant would have obtained a more favorable verdict absent the misconduct or error. (*People v. Bell* (1989) 49 Cal.3d 502, 534, 542 (*Bell*); *People v. Castillo* (2008) 168 Cal.App.4th 364, 386 (*Castillo*); *People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt. (*Castillo*, at pp. 386-387, fn. 9; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324.)

C

As the People assert, McClinton forfeited or waived her claim of prosecutorial misconduct regarding the prosecutor's closing arguments by not timely objecting to those arguments below and requesting a curative admonition. (*People v. Hinton*, *supra*, 37 Cal.4th at p. 863; *People v. Earp*, *supra*, 20 Cal.4th at p. 858.) The record shows McClinton did not object to any of the challenged closing arguments quoted above. Therefore, she cannot raise on appeal the issue of prosecutorial misconduct. (*Hinton*, at p. 863; *Earp*, at p. 858.) To the extent she relies on *People v. Lambert* (1975) 52 Cal.App.3d 905 as authority allowing her to raise this issue despite the absence of a timely objection and request for admonition, that case no longer appears to be valid or good authority for the principle McClinton cites. (*People v. Green* (1980) 27 Cal.3d 1,

28-34.)  In any event, we are not bound by that case and decline to apply its holding or reasoning to this case.

D

*Federal standard for prosecutorial error*.  Contrary to McClinton's assertion, we conclude the prosecutor's challenged closing arguments did *not* deprive her of a fundamentally fair trial under the federal Constitution.  Alternatively stated, the prosecutor's conduct did not infect the trial with such unfairness as to make her conviction a denial of due process.  (*Morales*, *supra*, 25 Cal.4th at p. 44.)  McClinton received a jury trial; was allowed to, and did, cross-examine witnesses against her; was allowed to, and did, present the testimony of witnesses (including her own testimony) and other evidence in her defense; and was not denied any of the other rights to which a criminal defendant is entitled under the federal Constitution.

Assuming arguendo Heller was, in fact, "unavailable" as a witness and the prosecutor was aware of her unavailability, the prosecutor nevertheless did not unfairly comment on, or argue regarding, the absence of Heller's testimony in McClinton's defense.  The prosecutor's closing argument simply pointed out the weakness of McClinton's defense and, in particular, the absence of corroboration of her self-serving testimony that she relied on Heller's advice regarding the legality of Tappert's methods. It is not improper for a prosecutor to comment on a defendant's failure to call logical witnesses (e.g., Heller).  (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1339; *People v. Medina*, *supra*, 11 Cal.4th at p. 755; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; *People v. Pinholster* (1992) 1 Cal.4th 865, 948.)  Because the prosecutor never asked the

30

jury to consider why McClinton did not call Heller to testify, he did not improperly imply she could and would have presented Heller's testimony if she truly believed it would aid in her defense. Unlike *Ford*, *supra*, 45 Cal.3d 431, and *People v. Frohner* (1976) 65 Cal.App.3d 94, cited by McClinton, the prosecutor in this case did not argue McClinton had subpoena power and could have called Heller as a witness. (*People v. Ford*, at p. 438; *Frohner*, at p. 108.) Accordingly, contrary to McClinton's assertion, we conclude the prosecutor's closing argument did *not* deprive her of a fundamentally fair trial under the federal Constitution or so infect the trial with such unfairness as to make her conviction a denial of due process. (*Morales*, *supra*, 25 Cal.4th at p. 44.)

E

Although we strongly doubt the prosecutor's closing argument constituted prosecutorial misconduct or error under the state standard as McClinton asserts (i.e., conduct involved the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury), we need not, and do not, decide the merits of that issue because that misconduct or error was not prejudicial under state law, i.e., it is not reasonably probable she would have obtained a more favorable verdict absent the misconduct or error. (*Bell*, *supra*, 49 Cal.3d at pp. 534, 542; *Castillo*, *supra*, 168 Cal.App.4th at p. 386; *Crew*, *supra*, 31 Cal.4th at p. 839.) Even had the prosecutor not commented during closing argument on Heller's failure to appear at trial and testify, it is not reasonably probable McClinton would have obtained a more favorable result. On cross-examination, McClinton admitted Heller had not yet come forward to testify at the trial. She also admitted she had a strong motive to tell the jury she relied on Heller's

31

advice. Therefore, regardless of any comment by the prosecutor during closing argument, the jury was aware of the absence of Heller at trial and any testimony she may have given to corroborate McClinton's testimony.

Furthermore, McClinton's defense was that she reasonably relied on Heller's advice that her conduct was legal and therefore she lacked the required mental state. However, McClinton did not testify Heller advised her that any of the specific transactions in this case were legal. She did not testify Heller advised her it was legal to sign and record any of the 12 deeds or lease property to the Castros or sell properties to Griffin that neither she, Tappert, nor Williams owned. On the contrary, McClinton testified that, *before* all of the transactions occurred in this case, Heller advised her only that Tappert's "process" was legal. The jury reasonably could have understood that testimony as meaning Heller advised McClinton regarding the legality of only Tappert's auditing of mortgage documents and suing of lenders for predatory lending practices. McClinton expressly denied Heller advised her she could: (1) legally cancel a deed of trust; (2) send notices of cancellation to parties involved in a deed of trust and, if they did not respond, consider their silence as acceptance of cancellation of the deed of trust; (3) eliminate a mortgage by filing a title document; and (4) file a title document and then sell the property related to that document without first paying off the mortgage.

Finally, it is unlikely a reasonable juror would have found credible McClinton's testimony that she held a reasonable, good faith belief that all of her alleged actions in this case were legal. It is unlikely a reasonable juror would have found McClinton reasonably believed in good faith that she could transfer title to her own house, *after* it

32

was foreclosed on by the lender, by having her son, daughter-in-law, and Williams sign various deeds purporting to transfer ownership of the house to associations she controlled. Likewise, it is unlikely a reasonable juror would have found McClinton reasonably believed in good faith that she and her cohorts could obtain legal title to, and sell or attempt to sell to Griffin, the four abandoned properties that were in foreclosure by signing various deeds even though they never had any previous ownership or other interest in those properties. It is unlikely a reasonable juror would find credible McClinton's claim that she was merely holding for Tappert for safekeeping the $300,000 in proceeds she received from the sale of two of those four properties. There were also many other actions taken by McClinton, which we need not list in detail, that would likely cause a reasonable juror to find incredible her testimony that she reasonably believed in good faith that all of her actions in this case were legal. Any error by the prosecutor in commenting on the absence of Heller at trial and the absence of her corroborating testimony was harmless and does not require reversal of the judgment. (*Bell*, *supra*, 49 Cal.3d at pp. 534, 542; *Castillo*, *supra*, 168 Cal.App.4th at p. 386; *Crew*, *supra*, 31 Cal.4th at p. 839.)

## VI

### *Ineffective Assistance of Counsel*

McClinton contends that if, as we concluded above, she forfeited or waived her claim that the prosecutor improperly argued in closing that she failed to present the testimony of Heller, who could have potentially given corroborating testimony, she was denied effective assistance of counsel.

33

A

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422, disapproved on another ground by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)  To show denial of the right to counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *Pope*, at p. 425.)  To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient.  (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt."  (*Strickland*, at p. 695.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*People v. Williams* (1997) 16 Cal.4th 153, 215.)  It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical

34

decisions. [Citation.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

However, a court need not address the issue of whether a defendant's counsel performed deficiently before it addresses the issue of whether the defendant was prejudiced by that purported deficient performance. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697; see *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

B

Assuming arguendo McClinton's counsel performed deficiently as she asserts, we nevertheless conclude she has not carried her burden on appeal to show that such deficient performance prejudiced her case. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692, 697; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *People v. Pope*, *supra*, 23 Cal.3d at p. 425.) Based on our review of the evidence as discussed in section V(E) above, which discussion we incorporate herein, we conclude it is not reasonably probable McClinton would have obtained a more favorable verdict had her counsel not performed deficiently as she asserts by not timely objecting to, and requesting curative admonitions for, the prosecutor's challenged comments during closing argument. Alternatively stated, our confidence in the outcome of McClinton's trial is not undermined by the purported deficient performance of her counsel. Because she was not prejudiced by her counsel's

35

purported deficient performance, she was not denied her constitutional right to effective assistance of counsel.  (*Strickland*, at pp. 687, 691-692, 697; *Ledesma*, at pp. 216-217; *Pope*, at p. 425.)

## DISPOSITION

McClinton's convictions on counts 13, 16, and 18, and the trial court's stays of imposition and execution of sentences on counts 9, 11, 12, 14, 15, and 17, are reversed. In all other respects, the judgment is affirmed.  The matter is remanded for resentencing consistent with this opinion.



McDONALD, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.